**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,     )<br>     Plaintiff,                             )<br>                                      )<br>     v.                                 )   CAUSE NO.: 2:13-CR-66-JVB-JEM<br>                                      )<br>VAHAN KELERCHIAN,                )<br>     Defendant.                       )| |

**OPINION AND ORDER**

This matter is before the Court on Defendant's Emergency Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (Compassionate Release) and Request for a Hearing [DE 262], filed September 10, 2020. The Government responded on September 24, 2020, and Defendant replied on October 1, 2020. The Court then ordered Defendant to produce medical records referenced in the briefing, and permitted supplemental briefing on those records. *See* [DE 268, 277, 280, 288]. For the reasons below, the Court denies Defendant's motion.

**BACKGROUND**

On May 17, 2013, an Indictment was filed charging Defendant with two counts of conspiracy to provide false statements, one count of conspiracy to defraud a government agency, four counts of making false statements to a government agency and aiding and abetting, one count of conspiracy to launder monetary instruments and aiding and abetting, and one count of bribery. In brief, Defendant was accused of conspiring with members of the Lake County Sheriff's Department to fraudulently obtain assault weapons not available to the public and sell parts of the weapons for profit. Defendant self-surrendered on May 20, 2013, pursuant to an arrest warrant. He was released pending trial on a $20,000 unsecured bond.

On October 20, 2015, a jury found Defendant guilty on eight of the nine counts and not guilty on the remaining count (bribery). At the May 5, 2018, sentencing hearing, the Court sentenced Defendant to a total of 100 months imprisonment and one year of supervised release. Defendant is currently confined at the Federal Correctional Facility in Fort Dix, New Jersey (FCI-Fort Dix).

On September 21, 2020, Defendant filed the instant motion, through counsel, asking to be released from prison is light of the COVID-19 pandemic and his age and various health conditions including obesity, hypertension, chronic obstructive pulmonary disease (COPD), asthma, and sinus and respiratory infections.

## ANALYSIS

Under 18 U.S.C. § 3582(c)(1)(A), the Court can grant a defendant's motion for compassionate release if the defendant complied with the administrative exhaustion requirement and the Court, having considered the factors found at 18 U.S.C. § 3553(a) as applicable, finds that extraordinary and compelling reasons warrant compassionate release and that compassionate release is consistent with the United States Sentencing Commission's applicable policy statements.

### A.  Administrative Exhaustion

The administrative exhaustion requirement is satisfied "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Defendant made written requests for compassionate release through counsel on March 30, 2020, and April 8, 2020, and made an undated request, apparently *pro se*, which was denied on August 20, 2020. *See* Reply Ex. 1 [DE 121]. Defendant has satisfied the administrative exhaustion requirement.

### B. Extraordinary and Compelling Reasons

Congress tasked the Sentencing Commission with promulgating a policy statement on § 3582(c)(1)(A) and the definition of "extraordinary and compelling reasons." 28 U.S.C. § 994(t). The policy statement, found in the application notes to § 1B1.13 of the United States Sentencing Guidelines Manual, provides, as is relevant here, that a defendant's medical condition is an extraordinary and compelling reason when the defendant's serious physical or medical condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility" and the defendant is not expected to recover from the condition. U.S. Sentencing Guidelines Manual § 1B1.13 cmt. 1.[1]

1. Defendant's Medical Conditions

Defendant identifies his age[2] (61) and various illnesses for the Court to consider in assessing his request for compassionate release: specifically, sinus infections, respiratory infections, asthma, bronchospasm, sciatica, hyperlipidemia, hypertension, gout, polyneuropathy, gastroesophageal reflux disease (GERD), obesity, COPD, osteoarthritis, and various leg injuries. Although the Court considers each condition, only a few of these conditions are identified by the CDC as creating an increased risk from COVID-19: namely, age, obesity, asthma, hypertension, and COPD.[3]

---

[1] The policy statement does not reflect the First Step Act's change to § 3582(c)(1)(A), which now permits a defendant to bring a motion for compassionate release.

[2] The CDC reports that the risk from COVID-19 increases with age, but denotes a particular risk for those 65 and older. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited December 8, 2020).

[3] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html; https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html (last visited December 8, 2020). The Court also addresses Defendant's sinus and respiratory infections and related symptoms, although neither condition, by itself, is listed by the CDC as producing a higher risk.

3

Defendant produced records from private doctors and the BOP's medical records in support of his motion. In brief, the records[4] indicate as follows: Defendant generally has sinus infections multiple times in a year. *See, e.g.,* Kelerchian 3 at 24 (March 6, 2018); Gringieri Records at 9-10 (October 4, 2017); 13 (October 10, 2016); 17 (May 2, 2016); 21 (September 26, 2015). He has also suffered from respiratory infections. *See* Kelerchian 3 at 51 (May 3, 2019; October 23, 2018); Kelerchian 2 at 19 (March 5, 2019). Symptoms have included a persistent cough, sore throat, shortness of breath, and fatigue. *See* Gringieri Records at 5-10, 13, Kelerchian 2 at 19. In October and November 2017, he was diagnosed with "sinobronchial syndrome" and bronchospasm, and was prescribed antibiotics, cough medicine, and an inhaler. Gringieri Records at 5, 9-10. In June 2020, he reported an "old history" of asthma with no current treatment, but has since been prescribed an inhaler as needed to "prevent/relieve [an] asthma attack." Kelerchian 1 at 9, 19. However, at his most recent medical visits, he has denied shortness of breath, has reported no acute discomfort, and has not presented with a cough. Ex. 2 to Gov't Supp. Resp. [DE 290] (November 19, 2020); Kelerchian 1 at 2 (September 17, 2020), 8-9 (July 23 and 29, 2020).

With regard to hypertension, his blood pressure was recently measured[5] at 132/83 (July 29, 2020); 133/86 (July 8, 2020); 159/93; and 157/103 (both June 17, 2020). *Id*. at 7, 11. In June 2020, he was prescribed blood pressure medications and counseled as to diet and exercise. *Id*. at 14-15. His most recent reading was 118/70, which is within normal limits. *See* Ex. 2 to Gov't Supp. Resp.

---

[4] Defendant submitted additional records to the Court in the form of a CD. *See* [DE 270]. The CD includes one set of records from private doctors, the BOP's medication summary, and three separate files containing the BOP's medical records. With some exceptions, the file named "Vahan Kelerchian 1" contains records from November 2019 to October 2020; "Vahan Kelerchian 2" contains records from March 2019 to September 2019; and "Vahan Kelerchian 3" contains records from March 2018 to September 2018. The private records cover events prior to November 2017. For ease of reference, the Court refers to the file name (e.g., "Kelerchian 1"), the page number of that file, and – where appropriate – the date of the relevant record.

[5] A reading of 120/80 is considered "normal," while a reading of 130/80 or higher indicates hypertension. *See* https://www.cdc.gov/bloodpressure/about.htm (last visited December 7, 2020).

[DE 290] (November 19, 2020). In July 2020, Defendant was recorded with a BMI of 33.9, Kelerchian 1 at 8, but there are no records of any significant treatment to address obesity. Although blood tests have shown him to have high cholesterol, *see, e.g.*, Kelerchian 3 at 66 (April 5, 2018), his most recent tests showed cholesterol levels within normal limits. *See* Kelerchian 1 at 35 (May 7, 2020). A document relating to his job duties in the prison includes the notation "COPD" (Kelerchian 1 at 74), but there is no apparent discussion of chronic obstructive pulmonary disorder in the medical records, and no evidence that it was diagnosed, nor does Defendant's doctor refer to it in his letter requesting compassionate release. The records largely substantiate Defendant's claims of other ailments not directly related to COVID-19, such as his leg injuries. However, they do not show that he has required aggressive treatment for his conditions, or that he would be unable to provide self-care at the correctional facility.

Defendant also submits two letters from his private doctor. One requests his release because "he is more vulnerable to coronavirus and if he contracts it more likely to die." Mot. Ex. A (April 9, 2020 Gringieri Letter) [DE 263-1]. The second indicates that he is at a "greatly increased risk of developing serious complications and death," citing six factors: hyperlipidemia, hypertension, age, obesity, use of omeprazole (a medication for GERD), and high levels of uric acid. Mot. Ex. B (June 25, 2020 Gringieri Letter) [DE 263-2]. Neither Dr. Gringieri nor the CDC indicates that sinus conditions increase the risk of serious illness from COVID-19.

The Court acknowledges that Defendant's conditions increase his risk; however, the letters and medical records do not establish the severity of the conditions in a way that shows them to be extraordinary and compelling reasons for release. Nor do the letters show that aggressive treatment is required for these conditions, or that they cannot be managed in the prison. Courts addressing the conditions identified by Dr. Gringieri have often found that, while they may result in increased

risk, that fact alone does not establish "extraordinary and compelling" circumstances meriting release. *See, e.g., United States v. Carter*, No. 20-2336, 2020 WL 7232003 (7th Cir. Dec. 8, 2020) (asthma, obesity, and hypertension); *United States v. McCloud*, No. 1:17-CR-57-HAB, 2020 WL 5406182 (N.D. Ind. Sept. 9, 2020) (age, hypertension, obesity, and high cholesterol); *United States v. Council*, No. 1:14-CR-14-5-TLS-SLC, 2020 WL 3097461, at *5 (N.D. Ind. June 11, 2020) (asthma, high blood pressure, and obesity); *United States v. Koons*, 455 F. Supp. 3d 285, 291 (W.D. La. 2020) (age, high blood pressure, high cholesterol, and acid reflux). The Court's research has not revealed a case in which increased uric acid or the use of omeprazole was cited as supporting a finding of compassionate release. *Cf. United States v. Costello*, No. 3:15-CR-72, 2020 WL 6118842, at *4 (M.D. Pa. Oct. 16, 2020) (successful treatment with omeprazole weighed against compassionate release). With regard to Defendant's obesity (a recorded BMI of 33.9), courts have emphasized the distinction between "obesity" – meaning a BMI above the threshold score of 30 – and "severe obesity" – a BMI of 40 or more, which carries a greater risk. *See*, *e.g.*, *United States v. Villasenor*, No. 03 CR 0689 (-02), 2020 WL 7129368, at *5-6 (N.D. Ill. Dec. 4, 2020); *United States v. Tranter*, No. 1:17-CR-22-HAB, 2020 WL 3841268, at *2, n.2 (N.D. Ind. July 8, 2020) ("With numbers in excess of 30 qualifying as obese, [a BMI of 33.1] is obese by BMI standards, if only just.").

In supplemental briefing, Defendant specifically alleges that the BOP "failed to recognize" his high blood pressure and failed to administer treatment. Between March 2018 and June 2020, during medical visits for other issues, Defendant consistently tested above the normal limits of 120/80. *See* Ex. C to Supplemental Reply [DE 282-3]. The records do not show that the prison medical staff diagnosed hypertension or offered treatment. In June 2020, following a reading of 159/93, he was diagnosed with hypertension and prescribed amlodipine and hydrochlorothiazide.

Kelerchian 1 at 14. From that point, his blood pressure declined, and on November 19, 2020 he was found to be within normal limits. *See id.* at 7, 11 (July 2020); Ex. 2 to Supp. Resp. [DE 290]. In a letter attached to the Government's briefing, Defendant's treating physician at the BOP states: "He was started on Amlodipine and Hydrochlorothiazide in June for modest elevations of his Blood Pressure." *See* Ex. 1 to Supp. Resp. [DE 290].

Neither the BOP doctor nor the Government addresses the readings of high blood pressure between March 2018 and June 2020. However, these facts do not show that hypertension cannot be treated at the prison. Even crediting Defendant's allegation that the prison should have intervened earlier, the evidence shows that after he was prescribed medication in June 2020, his blood pressure decreased, and has returned to normal levels. If there was medical error, it is not attributable to COVID-19, because most of the elevated readings occurred before the outbreak and Defendant continued to have medical visits after the outbreak began. To the extent his blood pressure remains an issue, the evidence indicates that it can be managed at the prison.

While Defendant's conditions put him at a higher risk than if he were healthy, the record does not support his contention that he would suffer "inevitable" serious illness or death if he were infected. In sum, Defendant's medical issues do not by themselves establish extraordinary and compelling circumstances.

    2.    <u>COVID-19 at FCI-Fort Dix</u>

The Court separately addresses Defendant's argument that his incarceration at FCI-Fort Dix significantly increases his risk of COVID-19 infection. The Court does not take this concern lightly, particularly given recent developments at FCI-Fort Dix. On the morning of October 30, 2020, of the 2,579 inmates at FCI-Fort Dix, the BOP reported 59 confirmed cases of COVID-19 among inmates. Later that day, the BOP reported 165 confirmed cases. *See* Defendant's November

5, 2020 Status Report [DE 274] (citing https://www.bop.gov/coronavirus/). As of December 7, 2020, the BOP reported 2,575 total inmates, of whom 103 inmates and 33 staff are listed as confirmed positive cases. *See* https://www.bop.gov/coronavirus/. 266 inmates and 6 staff members are listed as having "recovered," with no deaths reported among inmates or staff. *Id*.; *see also United Sates v. Mongelli*, No. 02-CR-307 (NGG), 2020 WL 6449237, at *3 (E.D.N.Y. Nov. 3, 2020) (noting "the failure of the Bureau of Prisons to prevent and control a COVID-19 outbreak at FCI Fort Dix").

On November 10, 2020, in a habeas corpus action in the District of New Jersey, the Government submitted a declaration from an associate warden at FCI-Fort Dix acknowledging an outbreak at Fort Dix and laying out steps the prison was taking to ameliorate it. *See Whiteside v. Fort Dix Federal Prison*, No. 1:20-CV-05544-NLH [DE 26-1] (D. N. J. November 10, 2020). Although FCI-Fort Dix has accepted transfers of COVID-19 positive inmates, the prison believes it appropriately quarantined those inmates and that they did not contribute to the outbreak. *Id*. at ¶ 9-14. The associate warden indicated that of the 229 active cases, 218 of them arose from a single housing unit of 231 inmates, all of whom were tested between October 20, 2020 and November 5, 2020. *Id*. at ¶ 15. In response, the prison has suspended all visitation, all contact between inmates of different housing units, and all transfers of inmates into and out of the prison, among other measures. *Id*. at ¶ 18-19.

Addressing the risk to Defendant, the Government points out that as of November 12, 2020, 8.23 percent of the population at FCI-Fort Dix had tested positive, while 8.2 percent of all tests taken in the United States in the previous week had come back positive. *See* Supp. Resp. [DE 277] at 10 (citing https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html). In the Government's view, this "reveal[s] that the dangers of contracting COVID in the incarcerated

8

conditions at Ft. Dix is almost identical to the risk of COVID posed to the non-incarcerated United States population." But to compare the infection rate of the entire prison to the rate among the fraction of Americans who seek out testing – and are disproportionately likely to be infected – distorts the picture. Since the pandemic began, roughly 4.46 percent of the U.S. population (14.64 million of roughly 328.2 million) has contracted COVID-19. *See* https://covid.cdc.gov/covid-data-tracker (last visited December 7, 2020). By contrast, at least 14.33 percent of Fort Dix inmates (369 out of 2,575) are or have been infected with COVID-19. While Defendant argues that the prison could not properly treat him if he were infected, it should be noted that the BOP reports no deaths from COVID-19 at the prison – although it is unclear whether that includes inmates who were released after contracting the virus.

The Court emphasizes that in denying Defendant's motion, it does not accept the Government's conclusion that Fort Dix "is still as safe (at least in regards to COVID) as any place else in the United States." However, the presence of COVID-19 in a prison, even in large numbers, does not justify compassionate release unless the inmate's medical conditions are sufficiently serious. *See, e.g., United States v. Buchanan*, No. 1:18-CR-21-HAB, 2020 WL 3790589, at *1 (N.D. Ind. July 7, 2020) (denying compassionate release from FCI-Elkton despite 360 active cases of COVID-19 among inmates); *United States v. Pena,* No. 2:15-CR-72-PPS, 2020 WL 3264113, at *3 (N.D. Ind. June 17, 2020) (denying compassionate release where "prison medical records indicate that Pena is generally in good health and his ailments are well-controlled" despite outbreak at FCI-Elkton); *see also United States v. Collins,* No. 14-CR-30038, 2020 WL 2301217, at *2 (C.D. Ill. May 8, 2020) ("[T]he COVID-19 pandemic does not warrant the release of every federal prisoner with health conditions that makes him more susceptible to the disease."). In this case, the

9

Court finds that Defendant's circumstances are not "extraordinary and compelling reasons" warranting compassionate release.

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES** Defendant's Emergency Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (Compassionate Release) and Request for a Hearing [DE 262].

SO ORDERED on December 9, 2020.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN, JUDGE
UNITED STATES DISTRICT COURT